COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT DEPARTMENT

SUFFOLK, ss                                      SUPERIOR COURT
                                                 CIVIL ACTION NO.

_____
UNDINI SANZ                            )
                                       )
        Plaintiff                      )
                                       )
v.                                     )
                                       )
CITY OF BOSTON – SOAR BOSTON           )
LEEROY PEEPLES,                        )
TALIA WRIGHT-RIVERA,  and              )
WASCAR CASTILLO                        )
        Defendants                     )
_____       )

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Parties, Jurisdiction and Venue

1. Plaintiff Undini Sanz ("Ms. Sanz" or "Plaintiff"), an individual residing at 131 Homestead Street Apt. 8 Dorchester MA 02121, was an Outreach and Engagement Coordinator for the City of Boston- SOAR program.

2. Defendant City of Boston - SOAR (Boston ("SOAR") is a gang intervention program located at 1483 Tremont Street, Dorchester, MA 02118.

3. Defendant Leeroy Peeples ("Mr. Peeples") is an individual residing at 5 Linden Park Drive, Randolph, MA 02368, and upon information and belief at all relevant times was the Strategy and Operations Manager at SOAR with managerial authority over all of its employees.

4. Defendant Talia Wright-Rivera ("Ms. Wright-Rivera") is an individual residing at 24 Rosewood Street, Mattapan, MA, 02126 and upon information and belief at all relevant

times was the Director of SOAR. Both have managerial authority over all of its employees.

5. Defendant Wascar Castillo ("Mr. Castillo")(collectively "Defendants") is an individual with a place of business at 1483 Tremont Street, Dorchester, MA 02118. Upon information and belief at all relevant times Mr. Castillo was the Director of Human Resources of SOAR.

6. Above him in management is Marta Rivera, now the new Commissioner, but at the time was Managing Director of the SOAR Program, William Morales, Director of BCYF (Boston Community Youth Fund), and Marty Martinez, the Chief of Human Resources at the time. Many of these direct reports to Ms. Rivera were family members or friends.

7. The Court has jurisdiction over this case pursuant to M.G.L. c. 233A § 2 and M.G.L. c. 212 § 4, and venue is appropriate because most or all of the parties reside in or do business in Suffolk County.

8. Ms. Sanz has complied with all prerequisites for filing.

## Facts

9. Plaintiff reasserts the facts set forth in paragraphs 1-8.

10. SOAR is a gang intervention program in the City of Boston, providing resources for gang prevention and intervention to at-risk teens and adults.

11. The SOAR program employs approximately 33 individuals, of whom approximately 31 are people of color.

12. Blacks are largely Streetworkers and Senior Supervising Streetworkers, while Hispanics are largely in Management roles.

13. SEIU Local 888 is the union to which most of the employees of the SOAR Program belong.

14. Ms. Sanz was hired in August of 2015 as a Street Worker/Outreach Coordinator by the City of Boston. The program later became the SOAR Boston program, but both roles were essentially the same.

15. Ms. Sanz's Supervisor was Robyn Christian, Senior Streetworker. Leeroy Peeples is the Assistant Manager of the Program, and his manager is Talia Wright-Rivera.

16. Prior to Wright-Rivera taking on the role of Director of SOAR, the atmosphere in the program had been collegial and like a family.

17. Defendant Wright-Rivera had been a Streetworker in 2006 for the City's gang intervention program at that time; she left at some point thereafter and was rehired as the Director of SOAR in July 2019.

18. Robyn Christian, a Black Senior Supervising Streetworker, was targeted by Leeroy, who said she was too old and had been there too long. She is approximately 53. She has been there since program started.

19. Wright-Rivera and Peeples harassed Robert Miller, who had a disability and stage four cancer. They refused to accommodate his disability. Miller had to wear Depends as a result of his disability, and Peeples and Wright-Rivera made fun of him, both in front of him and behind his back for it. They would refuse to allow him to take the van as an accommodation to his disability, so he had to walk everywhere.

20. In December 2019, Jackie Perry (in her 60s) was harassed for her age and her disability after she had back surgery.

21. Ms. Sanz objected to the discrimination and was then targeted with more work and harsher treatment.

22. In 2019 and 2020 at roll-call meetings with about 30 employees present, Ms. Wright-Rivera would single individuals out and ask, "Are you still here? Don't you want to move on? This is a job for young people." She said this to Jamaine Gaitor in front of the group.

23. In the roll-call open meetings, Wright-Rivera said that people who were over 40 were too old for the job, that this was a job for young people.

24. On or about November 2019 Ms. Sanz requested and was then approved to take leave under the Family and Medical Leave Act (FMLA) to care for her ill father who lived in the Dominican Republic and had been being abused by his caretaker. Ms. Sanz was out on leave for a total of approximately seven (7) days. At the time, Ms. Sanz explained to Wright-Rivera the reasons for her leave request.

25. Ms. Sanz was given little direction in the application process. Where she has been approved, she assumed she would be able to return to work without issue.

26. When Ms. Sanz returned to work in mid-November, 2019, Defendants opened an investigation into the use of her leave time, and had marked her out as "Away Without Leave" (AWOL) during the FMLA leave. Wright-Rivera asserted that Ms. Sanz did not follow protocols for applying for leave.

27. The leave protocols were unclear to Ms. Sanz. She had contacted Wascar Castillo regarding her request for leave and another Human Resource Representative for assistance in completing the application. Mr. Castillo provided little assistance with Ms. Sanz's application for leave, and failed to engage in an interactive dialog with her in doing so.

28. Defendants scheduled a hearing on November 15, 2019 on the question of whether Ms. Sanz had abused leave time. Defendants then postponed the hearing and never rescheduled it. As far as she knows, the allegation is still in her personnel file.

29. In or about December 2019, Talia Wright-Rivera, Director of SOAR, made it mandatory for all streetworkers in the SOAR Program to drive around the city together in crowded vans. Usually this meant in a van with between 14 to 16 people. In the many years that the program existed, this had never been a requirement. Workers had always been allowed to take their own car and meet the team at a given location.

30. In December 2019, when this new mandate was announced, Ms. Sanz and Stephen Powell, another streetworker, asked to use their own cars rather than get in the van. Ms. Sanz explained that she had health issues (anxiety, depression and PTSD) that would be exacerbated by driving in the van. Wright -Rivera said no, both Powell and Plaintiff had to use the crowded van. When they used their own cars, they were given warnings for doing so. These were written warnings, instead of the progressive discipline the union contract provided for, which required a verbal warning first.

31. Wright-Rivera required employees to get in crowded vans together even after mandated Covid-19 protocols were put in place by the Governor in March 2020.

32. After the first van incident in December 2019, Plaintiff experienced an increase in her workload. Before December 2019 Ms. Sanz has approximately 25 youths for which she provided assistance. That number began to increase thereafter, until eventually she had approximately 48 cases and youths to cover. This was significantly higher the most of the other streetworkers. Streetworkers that did not complain about the safety or other management issues did not have their caseloads increase.

33. On or about April 15, 2020, when Ms. Sanz objected to getting in the van again, she received a written warning again without progressive discipline. This is despite the fact that the employees all knew that one of their colleagues at the time, Dennis Avila, who was also required to get on the van, had recently been exposed to Covid-19 and had been ordered by Wright-Rivera to come to work during his quarantine period. Avila got sick with Covid-19 shortly after this, and caught it a second time as well. Defendants never told Ms. Sanz or anyone about the fact that Avila or anyone else caught Covid-19.

34. As a result, Ms. Sanz felt unsafe driving in vans with others during the first wave of the Covid-19 spike. The vans were dirty and often had used needles inside, as homeless people used them when they were parked, unlocked. Ms. Sanz was caring for her ill son and has her own health issues, including anxiety, depression and PTSD, which would be exacerbated if she were to catch Covid-19.

35. After being given the written warning in late April 2020, Ms. Sanz obtained a letter from her psychiatrist that she should be given an accommodation to these disabilities by being allowed to take her own car rather than the van. Notwithstanding receiving this letter from Ms. Sanz's psychiatrist, Wright-Rivera still required her to get in the crowded van.

36. In or about later January or early February 2020, due to the hostility of the work environment, a meeting was set up for staff by staff to express their feelings and concerns. Employees set up zoom meetings monthly from December 2020 through the coming months to discuss how management was mishandling the Covid-19 pandemic and what could be done.

37. The hostility and targeting of employees by Wright-Rivera and Peeples got more severe during the Covid-19 pandemic. Wright-Rivera believed that people were lying about having Covid-19 and she would open investigations into their illness and leave time.

38. This management style by Talia Wright-Rivera and Leroy Peeples has and continues to foster a hostile and intimidating work environment that is unbearable to work in.

39. Ms. Wright-Rivera, and Mr. Peeples have directly retaliated against other employees who speak out against their practices, such as Jamaine Gaitor, Tariq Jamison, Tim Buryne, Dana Burrus, Alexandra Carillo, Stephen Powell, as well as Ms. Sanz. The targeted person's caseload would increase after he or she spoke out.

40. Other Streetworkers who did not speak out, had regularly no more than 15 to 20 youths to assist. Maria, last name unknown, who was Hispanic, had approximately 15 youths. Alonzo, last name unknown, who had not spoken out, had approximately 20 youths. Dana Burrus did speak out against the management's practices and had 40 or 50 youths during this time. Mr. Powell had close to 70.

41. Ms. Sanz had 48 youths to assist during this time. She objected to this but the cases kept being assigned to her.

42. When Ms. Sanz couldn't keep up with the work, Peeples and Wright-Rivera would threaten to write her up. They told her she needed to leave if she could not handle the absurd caseload.

43. Wright-Rivera and Peeples acted purposely with the intent to intimidate and instill fear in their employees. Ms. Wright-Rivera, and Mr. Peeples on numerous occasions made threats that "the union can't save you", and "the union is for bad employees". Two of the union representatives have been severely disciplined (one, Tariq Jamison, was placed on

7

extended administrative leave, and the other, Jamaine Gaitor, a 14-year veteran, was terminated) for nothing more than speaking up for workers' rights.

44. On or about October 8, 2020, in a regular daily roll call meeting of about 30 people, the group raised a complaint with Wright-Rivera for not following Covid-19 protocols, specifically that they had no Personal Protective Equipment (PPE), no plastic shields for cubicles or desks, no one coming through every two hours to wipe down common areas, no hot water in the building, and no one screening individuals for covid symptoms when they came into the building.

45. The receptionist contracted Covid-19, and everyone had to walk past her central desk. In Ms. Sanz's department, at least 10 people contracted Covid-19 out of 33.

46. Management refused to divulge who had contracted Covid-19 or been exposed, so one would only hear by word of mouth, though afew employees came forward publicly. Upon information, they were told or at least encouraged by Management not to divulge it.

47. Wright-Rivera gave all employees five throw-away masks and told them to keep recycling them.

48. Ms. Wright-Rivera still required the employees to come in, and to get on the crowded vans. Wright-Rivera told employees that if they had a problem then they should use sick or vacation time, FMLA or to "do what you have to do."

49. In June of 2020 Ms. Sanz did take FMLA as a result the on-going safety issues and stress that work was causing her.

50. In or about October 2020, a number of employees, including Ms. Sanz while on leave, sent a letter to the Boston Public Health Commission, Mayor Marty Walsh, Marty

Martinez, the Chief of Human Services, Boston City Council members and others

complaining about the lack of Covid-19 protocols in place.

51. Defendants would have known who signed this letter, including Ms. Sanz.

52. There was no justification given for why the employees needed to travel in crowded vans

during the Covid-19 pandemic.

53. Wright-Rivera told them that they must come in because they were essential workers.

This was the first time the employees had ever been told that they were essential workers.

They had never been required to come to work in snowstorms or other emergencies.

54. In November 2020, Union Steward Jamaine Gaitor was terminated. Anyone who

supported Mr. Gaitor was targeted after his termination, including Stephen Powell, Tariq

Jamison (another union steward), Tim Buryne, and Ms. Sanz. These workers have either

left the program or been transferred to other City jobs. Numerous older workers have

given their notice or already left. These are people with more than 10 years of seniority,

who are over 40.

55. After Ms. Sanz returned to work in February 2021, Ms. Sanz learned in March 2021 that

Mr. Peeples, for no reason associated with SOAR's best interest, had told gang members

in Ms. Sanz's assigned area that she lived in a rival gang's territory. This caused the gang

members with whom she worked to suspect her of colluding with the rival gang to obtain

inside information about them. This was not the case but Ms. Sanz understood that not all

gang members were convinced.

56. As a result of this unprofessional, dangerous, and retaliatory revelation by Peeples, Ms.

Sanz no longer felt safe in her assigned area. Ms. Sanz became fearful to work in her

assigned area and had to take FMLA for safety reasons, which began July 2021.

57. During this time that she was on leave she applied for a position at the Boston Public Schools (BPS), as a Family Liaison, doing much of the same work she was doing for SOAR. As there was an overlap in the shifts of each job, Ms. Sanz requested an accommodation to change the hours in which she worked at SOAR to accommodate her work schedule at BPS. Other workers had been allowed to work remotely.

58. On or about August 28, 2021, Ms. Sanz put in a disclosure to the City that she was working both jobs and wished to continue to do so with the accommodation noted above. On September 7, 2021, BPS submitted one as well.

59. That same day Defendants terminated Ms. Sanz from her position with SOAR without ever contacting her to discuss the accommodation requested, or to discuss her transfer from SOAR to BPS, which was done without her consent or notice.

60. Ms. Sanz believes this was in retaliation for speaking out against management's hostile, discriminatory and unsafe practices, and because she had taken FMLA leave.

## COUNT I
### Retaliation in Violation of the Massachusetts Whistleblower Act,
### M.G.L. c.149, sec. 185 (b)(1)
*Defendant City of Boston*

61. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

62. Defendants' actions constitute retaliation for disclosing a violation of the Covid-19 mandate, which was a risk to public health and safety, in violation of M.G.L. c.149, sec. 185(b)(1).

63. As a result of Defendants' actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

64. Defendants are liable for three times the amount of Ms. Sanz's lost wages, front and back

    pay, attorneys' fees and costs, multiple damages, compensatory damages, punitive and

    other damages so proven at trial.

## COUNT II
### Retaliation in Violation of the Massachusetts Whistleblower Act,
### M.G.L. c.149, sec. 185 (b) (3)
*Defendant City of Boston*

65. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

66. Defendants' actions constitute retaliation for Ms. Sanz's refusal to participate in actions

    which violate the law or which put public health or safety at risk, in violation of M.G.L.

    c.149, sec. 185(b)(3).

67. As a result of Defendants' actions, Ms. Sanz has suffered lost wages, both front and back

    pay, compensatory damages and emotional distress.

68. Defendants are liable for three times the amount of Ms. Sanz's lost wages, front and back

    pay, attorneys' fees and costs, compensatory damages, punitive and other damages so

    proven at trial.

## COUNT III
### Intentional Infliction of Emotional Distress
*All Defendants*

69. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

70. Defendants' actions constitute intentional infliction of emotional distress.

71. Defendants are liable for Plaintiff's lost wages, front and back pay, compensatory

    damages, punitive and other damages so proven at trial.

## COUNT IV
### Breach of Implied Covenant of Good Faith and Fair Dealing
*All Defendants*

72. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

73. Defendants' actions constitute a breach of the Implied Covenant of Good Faith and Fair Dealing.

74. As a result of Defendants' actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

75. Defendants are liable for Ms. Sanz's lost wages, front and back pay, compensatory damages, punitive and other damages so proven at trial.


WHEREFORE, the Plaintiff, Ms. Sanz, requests that the Court:

a. Award full amount of her damages incurred as a result of Defendants' retaliatory actions, including without limit punitive damages, reasonable attorneys' fees and costs incurred;

b. Award Ms. Sanz multiple damages for Defendants' violations of M.G.L. c.149 section 185; and

c. Award the Ms. Sanz such other and further relief as the Court deems appropriate.

**PLAINTIFF CLAIMS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE.**

Respectfully submitted,
Plaintiff,
UNDINI SANZ,

By Her Attorney,


/s/ Janet Ruggieri
Janet Ruggieri, BBO#634431
Murphy & Rudolf, LLP
Worcester, MA 01608
Telephone: (508) 425-6330
Fax: (508) 536-0834
ruggieri@murphyrudolf.com

Dated: November 18, 2021


## VERIFICATION OF COMPLAINT

I, Undini Sanz, do hereby swear and affirm under the pains and penalties of perjury that the above facts are true and accurate to the best of my recollection.


Dated: November 18, 2021                    /s/ Undini Sanz
                                            Undini Sanz

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| | | COUNTY Suffolk |

| | |
|---|---|
| **Plaintiff:** Undini Sanz | **Defendant:** City of Boston – Soar Boston |
| ADDRESS: 131 Homestead Street Apt. 8, Dorchester, MA 02121 | ADDRESS: 1483 Tremont Street, Dorchester, MA 02118 |
| | Defendant: Leeroy Peeples |
| | ADDRESS:  5 Linden Park Drive, Randolph MA 02368 |
| **Plaintiff Attorney:**  Janet R. Ruggieri | Defendant: Talia Wright-Rivera |
| ADDRESS: Murphy & Rudolf, LLP | ADDRESS: 24 Rosewood Street, Mattapan, MA 02126 |
| 1 Mercantile Street, Suite 740, Worcester MA 01608 | Defendant: Wascar Castillo |
| | ADDRESS: 1483 Tremont Street, Dorchester, MA 02118 |
| BBO: 634431 | |

## TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| AB1 | Tortious Action involving Municipality | A | ● YES    ☐ NO |

**\*If "Other" please describe:** _____

Is there a claim under G.L. c. 93A?          Is there a class action under Mass. R. Civ. P. 23?
☐ YES    ● NO                    ☐ YES    ● NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date

    1. Total hospital expenses _____

    2. Total doctor expenses _____

    3. Total chiropractic expenses _____

    4. Total physical therapy expenses _____

    5. Total other expenses (describe below) _____

    _____

                                     Subtotal (1-5): _____

B. Documented lost wages and compensation to date _____

C. Documented property damages to date _____

D. Reasonably anticipated future medical and hospital expenses _____

E. Reasonably anticipated lost wages _____

F. Other documented items of damages (describe below)          $100,000.00+

    Violations of M.G.L. c. 149, § 185(b); M.G.L. c. 151B, sec 4; § 42 U.S.C. § 2003-2(a)(1) U.S.C.

                              TOTAL (A-F):          **$100,000.00+**

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

_____

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

| | |
|---|---|
| Signature of Attorney/Unrepresented Plaintiff: X _/s/ Janet Ruggieri_ | Date: 11/22/2021 |

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| | |
|---|---|
| Signature of Attorney/Unrepresented Plaintiff: X _/s/ Janet Ruggieri_ | Date: 11/22/2021 |

| TRIAL COURT OF MASSACHUSETTS | NOTICE OF APPEARANCE | |
|---|---|---|

| COURT DEPARTMENT | DIVISION OR COUNTY | COURT USE ONLY |
|---|---|---|
| SUPERIOR | SUFFOLK | |

| CASE NAME | DOCKET NUMBER |
|---|---|
| *[In Matter of]* <br><br> Undini Sanz <br><br> *[v.]* <br><br> <u>City of Boston – Soar Boston et al</u> | |

## TO THE CLERK- MAGISTRATE / RECORDER / REGISTER:

Please enter my appearance in the above-named matter

☐ for myself.

◉ as attorney for   <u>Undini Sanz</u>

(Name(s))

| NAME (FIRST, MIDDLE, LAST) <br><br> Janet Ruggieri | B.B.O. NUMBER (IF APPLICABLE) <br><br> 634431 |
|---|---|
| FIRM OR AGENCY NAME (IF APPLICABLE) <br><br> Murphy & Rudolf, LLP | OFFICE OR HOME PHONE NUMBER <br> (508) 425-6330 |
| STREET ADDRESS <br><br> 1 Mercantile Street, Suite 740 | APT/UNIT # | MOBILE PHONE NUMBER <br><br> FAX NUMBER |

| CITY/TOWN <br><br> Worcester | STATE <br><br> MA | ZIP CODE <br><br> 01608 | E-MAIL ADDRESS <br><br> ruggieri@murphyrudolf.com |
|---|---|---|---|
| DATED <br><br> 11/02/2021 | SIGNATURE <br><br> **X** */s/ Janet Ruggieri* | | |

| TRIAL COURT OF MASSACHUSETTS | NOTICE OF APPEARANCE | |
|---|---|---|

| COURT DEPARTMENT | DIVISION OR COUNTY | COURT USE ONLY |
|---|---|---|
| SUPERIOR | SUFFOLK | |

| CASE NAME | DOCKET NUMBER |
|---|---|
| *[In Matter of]* | |
| Undini Sanz | |
| *[v.]* | |
| City of Boston – SOAR, et al | |

## TO THE CLERK- MAGISTRATE / RECORDER / REGISTER:

Please enter my appearance in the above-named matter

☐ for myself.

◉ as attorney for  Undini Sanz

(Name(s))

| NAME (FIRST, MIDDLE, LAST) | B.B.O. NUMBER (IF APPLICABLE) |
|---|---|
| Benjamin C. Rudolf | 667695 |
| FIRM OR AGENCY NAME (IF APPLICABLE) | OFFICE OR HOME PHONE NUMBER (508) 425-6330 |
| Murphy & Rudolf, LLP | MOBILE PHONE NUMBER |
| STREET ADDRESS | APT/UNIT # | |
| 1 Mercantile Street, Suite 740 | | FAX NUMBER |
| CITY/TOWN | STATE | ZIP CODE | E-MAIL ADDRESS |
| Worcester | MA | 01608 | brudolf@murphyrudolf.com |
| DATED | SIGNATURE |
| 11/22/2021 | **X** */s/ Benjamin C. Rudolf* |

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT DEPARTMENT

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION NO.

| | |
|---|---|
| UNDINI SANZ | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF BOSTON – SOAR BOSTON | ) |
| LEEROY PEEPLES, | ) |
| TALIA WRIGHT-RIVERA, and | ) |
| WASCAR CASTILLO | ) |
| Defendants | ) |

## MOTION TO APPOINT SPECIAL PROCESS SERVER UNDER RULE 4C OF THE MASSACHUSETTS RULES OF CIVIL PROCEDURE

The Plaintiff moves this Honorable Court to appoint FRANCIS J. TRAPASSO

AND/OR HIS/HER AGENTS, a Constable/Process Server and a qualified and knowledgeable

person in the service of court process and not a party to the action, a disinterested person who is

over 18 to be specially appointed by the court to serve the process in this action under the

provision of Rule 4C of the Massachusetts Rules of the civil procedure in order to assure a

substantial savings in time.

Respectfully Submitted,
Plaintiff Undini Sanz,
By her attorney,


/s/ Janet Ruggieri
Janet Ruggieri, Esq.
BBO# 634431
Murphy & Rudolf, LLP
1 Mercantile Street, Suite 740
Worcester, MA 01608
T: (508) 425 – 6330
F: (508) 536 – 0834
ruggieri@murphyrudolf.com

Dated: November 22, 2021

ORDER OF THE COURT APPOINTING A SPECIAL PROCESS SERVER

PURSUANT TO RULE 4C, IT IS ORDERED THAT FRANCIS J. TRAPASSO AND/OR

HIS/HER AGENTS IS HEREBY APPOINTED A SPECIAL PROCESS SERVER FOR THE

ABOVE CAPTIONED CAUSE.


By: _____

Title: _____

Court: __Suffolk Superior Court_____

Date: _____

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT DEPARTMENT

SUFFOLK, ss                                    SUPERIOR COURT
                                               CIVIL ACTION NO. 2184CV2683

_____
UNDINI SANZ                              )
                                         )
        Plaintiff                        )
                                         )
v.                                       )
                                         )
CITY OF BOSTON – SOAR BOSTON             )
LEEROY PEEPLES,                          )
TALIA WRIGHT-RIVERA,  and                )
WASCAR CASTILLO                          )
        Defendants                       )
_____)

## FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

### Parties, Jurisdiction and Venue

1. Plaintiff Undini Sanz ("Ms. Sanz" or "Plaintiff"), an individual residing at 131
   Homestead Street Apt. 8 Dorchester MA 02121, was an Outreach and Engagement
   Coordinator for the City of Boston- SOAR program.

2. Defendant City of Boston - SOAR (Boston ("SOAR") is a gang intervention program
   located at 1483 Tremont Street, Dorchester, MA 02118.

3. Defendant Leeroy Peeples ("Mr. Peeples") is an individual residing at 5 Linden Park
   Drive, Randolph, MA 02368, and upon information and belief at all relevant times was
   the Strategy and Operations Manager at SOAR with managerial authority over all of its
   employees.

4. Defendant Talia Wright-Rivera ("Ms. Wright-Rivera") is an individual residing at 24
   Rosewood Street, Mattapan, MA, 02126 and upon information and belief at all relevant

times was the Director of SOAR. Both have managerial authority over all of its employees.

5. Defendant Wascar Castillo ("Mr. Castillo")(collectively "Defendants") is an individual with a place of business at 1483 Tremont Street, Dorchester, MA 02118. Upon information and belief at all relevant times Mr. Castillo was the Director of Human Resources of SOAR.

6. Above him in management is Marta Rivera, now the new Commissioner, but at the time was Managing Director of the SOAR Program, William Morales, Director of BCYF (Boston Community Youth Fund), and Marty Martinez, the Chief of Human Resources at the time. Many of these direct reports to Ms. Rivera were family members or friends.

7. The Court has jurisdiction over this case pursuant to M.G.L. c. 233A § 2 and M.G.L. c. 212 § 4, and venue is appropriate because most or all of the parties reside in or do business in Suffolk County.

8. Ms. Sanz has complied with all prerequisites for filing.

**Facts**

9. Plaintiff reasserts the facts set forth in paragraphs 1-8.

10. SOAR is a gang intervention program in the City of Boston, providing resources for gang prevention and intervention to at-risk teens and adults.

11. The SOAR program employs approximately 33 individuals, of whom approximately 31 are people of color.

12. Blacks are largely Streetworkers and Senior Supervising Streetworkers, while Hispanics are largely in Management roles.

13. SEIU Local 888 is the union to which most of the employees of the SOAR Program belong.

14. Ms. Sanz was hired in August of 2015 as a Street Worker/Outreach Coordinator by the City of Boston. The program later became the SOAR Boston program, but both roles were essentially the same.

15. Ms. Sanz's Supervisor was Robyn Christian, Senior Streetworker. Leeroy Peeples is the Assistant Manager of the Program, and his manager is Talia Wright-Rivera.

16. Prior to Wright-Rivera taking on the role of Director of SOAR, the atmosphere in the program had been collegial and like a family.

17. Defendant Wright-Rivera had been a Streetworker in 2006 for the City's gang intervention program at that time; she left at some point thereafter and was rehired as the Director of SOAR in July 2019.

18. Robyn Christian, a Black Senior Supervising Streetworker, was targeted by Leeroy, who said she was too old and had been there too long. She is approximately 53. She has been there since program started.

19. Wright-Rivera and Peeples harassed Robert Miller, who had a disability and stage four cancer. They refused to accommodate his disability. Miller had to wear Depends as a result of his disability, and Peeples and Wright-Rivera made fun of him, both in front of him and behind his back for it. They would refuse to allow him to take the van as an accommodation to his disability, so he had to walk everywhere.

20. In December 2019, Jackie Perry (in her 60s) was harassed for her age and her disability after she had back surgery.

3

21. Ms. Sanz objected to the discrimination and was then targeted with more work and harsher treatment.

22. In 2019 and 2020 at roll-call meetings with about 30 employees present, Ms. Wright-Rivera would single individuals out and ask, "Are you still here? Don't you want to move on? This is a job for young people." She said this to Jamaine Gaitor in front of the group.

23. In the roll-call open meetings, Wright-Rivera said that people who were over 40 were too old for the job, that this was a job for young people.

24. On or about November 2019 Ms. Sanz requested and was then approved to take leave under the Family and Medical Leave Act (FMLA) to care for her ill father who lived in the Dominican Republic and had been being abused by his caretaker. Ms. Sanz was out on leave for a total of approximately seven (7) days. At the time, Ms. Sanz explained to Wright-Rivera the reasons for her leave request.

25. Ms. Sanz was given little direction in the application process. Where she has been approved, she assumed she would be able to return to work without issue.

26. When Ms. Sanz returned to work in mid-November, 2019, Defendants opened an investigation into the use of her leave time, and had marked her out as "Away Without Leave" (AWOL) during the FMLA leave. Wright-Rivera asserted that Ms. Sanz did not follow protocols for applying for leave.

27. The leave protocols were unclear to Ms. Sanz. She had contacted Wascar Castillo regarding her request for leave and another Human Resource Representative for assistance in completing the application. Mr. Castillo provided little assistance with Ms. Sanz's application for leave, and failed to engage in an interactive dialog with her in doing so.

4

28. Defendants scheduled a hearing on November 15, 2019 on the question of whether Ms. Sanz had abused leave time. Defendants then postponed the hearing and never rescheduled it. As far as she knows, the allegation is still in her personnel file.

29. In or about December 2019, Talia Wright-Rivera, Director of SOAR, made it mandatory for all streetworkers in the SOAR Program to drive around the city together in crowded vans. Usually this meant in a van with between 14 to 16 people. In the many years that the program existed, this had never been a requirement. Workers had always been allowed to take their own car and meet the team at a given location.

30. In December 2019, when this new mandate was announced, Ms. Sanz and Stephen Powell, another streetworker, asked to use their own cars rather than get in the van. Ms. Sanz explained that she had health issues (anxiety, depression and PTSD) that would be exacerbated by driving in the van. Wright -Rivera said no, both Powell and Plaintiff had to use the crowded van. When they used their own cars, they were given warnings for doing so. These were written warnings, instead of the progressive discipline the union contract provided for, which required a verbal warning first.

31. Wright-Rivera required employees to get in crowded vans together even after mandated Covid-19 protocols were put in place by the Governor in March 2020.

32. After the first van incident in December 2019, Plaintiff experienced an increase in her workload. Before December 2019 Ms. Sanz has approximately 25 youths for which she provided assistance. That number began to increase thereafter, until eventually she had approximately 48 cases and youths to cover. This was significantly higher the most of the other streetworkers. Streetworkers that did not complain about the safety or other management issues did not have their caseloads increase.

33. On or about April 15, 2020, when Ms. Sanz objected to getting in the van again, she received a written warning again without progressive discipline. This is despite the fact that the employees all knew that one of their colleagues at the time, Dennis Avila, who was also required to get on the van, had recently been exposed to Covid-19 and had been ordered by Wright-Rivera to come to work during his quarantine period. Avila got sick with Covid-19 shortly after this, and caught it a second time as well. Defendants never told Ms. Sanz or anyone about the fact that Avila or anyone else caught Covid-19.

34. As a result, Ms. Sanz felt unsafe driving in vans with others during the first wave of the Covid-19 spike. The vans were dirty and often had used needles inside, as homeless people used them when they were parked, unlocked. Ms. Sanz was caring for her ill son and has her own health issues, including anxiety, depression and PTSD, which would be exacerbated if she were to catch Covid-19.

35. After being given the written warning in late April 2020, Ms. Sanz obtained a letter from her psychiatrist that she should be given an accommodation to these disabilities by being allowed to take her own car rather than the van. Notwithstanding receiving this letter from Ms. Sanz's psychiatrist, Wright-Rivera still required her to get in the crowded van.

36. In or about later January or early February 2020, due to the hostility of the work environment, a meeting was set up for staff by staff to express their feelings and concerns. Employees set up zoom meetings monthly from December 2020 through the coming months to discuss how management was mishandling the Covid-19 pandemic and what could be done.

37. The hostility and targeting of employees by Wright-Rivera and Peeples got more severe during the Covid-19 pandemic. Wright-Rivera believed that people were lying about having Covid-19 and she would open investigations into their illness and leave time.

38. This management style by Talia Wright-Rivera and Leroy Peeples has and continues to foster a hostile and intimidating work environment that is unbearable to work in.

39. Ms. Wright-Rivera, and Mr. Peeples have directly retaliated against other employees who speak out against their practices, such as Jamaine Gaitor, Tariq Jamison, Tim Buryne, Dana Burrus, Alexandra Carillo, Stephen Powell, as well as Ms. Sanz. The targeted person's caseload would increase after he or she spoke out.

40. Other Streetworkers who did not speak out, had regularly no more than 15 to 20 youths to assist. Maria, last name unknown, who was Hispanic, had approximately 15 youths. Alonzo, last name unknown, who had not spoken out, had approximately 20 youths. Dana Burrus did speak out against the management's practices and had 40 or 50 youths during this time. Mr. Powell had close to 70.

41.  Ms. Sanz had 48 youths to assist during this time. She objected to this but the cases kept being assigned to her.

42. When Ms. Sanz couldn't keep up with the work, Peeples and Wright-Rivera would threaten to write her up. They told her she needed to leave if she could not handle the absurd caseload.

43. Wright-Rivera and Peeples acted purposely with the intent to intimidate and instill fear in their employees. Ms. Wright-Rivera, and Mr. Peeples on numerous occasions made threats that "the union can't save you", and "the union is for bad employees". Two of the union representatives have been severely disciplined (one, Tariq Jamison, was placed on

7

extended administrative leave, and the other, Jamaine Gaitor, a 14-year veteran, was terminated) for nothing more than speaking up for workers' rights.

44. On or about October 8, 2020, in a regular daily roll call meeting of about 30 people, the group raised a complaint with Wright-Rivera for not following Covid-19 protocols, specifically that they had no Personal Protective Equipment (PPE), no plastic shields for cubicles or desks, no one coming through every two hours to wipe down common areas, no hot water in the building, and no one screening individuals for covid symptoms when they came into the building.

45. The receptionist contracted Covid-19, and everyone had to walk past her central desk. In Ms. Sanz's department, at least 10 people contracted Covid-19 out of 33.

46. Management refused to divulge who had contracted Covid-19 or been exposed, so one would only hear by word of mouth, though afew employees came forward publicly. Upon information, they were told or at least encouraged by Management not to divulge it.

47. Wright-Rivera gave all employees five throw-away masks and told them to keep recycling them.

48. Ms. Wright-Rivera still required the employees to come in, and to get on the crowded vans. Wright-Rivera told employees that if they had a problem then they should use sick or vacation time, FMLA or to "do what you have to do."

49. In June of 2020 Ms. Sanz did take FMLA as a result the on-going safety issues and stress that work was causing her.

50. In or about October 2020, a number of employees, including Ms. Sanz while on leave, sent a letter to the Boston Public Health Commission, Mayor Marty Walsh, Marty

Martinez, the Chief of Human Services, Boston City Council members and others
complaining about the lack of Covid-19 protocols in place.

51. Defendants would have known who signed this letter, including Ms. Sanz.

52. There was no justification given for why the employees needed to travel in crowded vans
during the Covid-19 pandemic.

53. Wright-Rivera told them that they must come in because they were essential workers.
This was the first time the employees had ever been told that they were essential workers.
They had never been required to come to work in snowstorms or other emergencies.

54. In November 2020, Union Steward Jamaine Gaitor was terminated. Anyone who
supported Mr. Gaitor was targeted after his termination, including Stephen Powell, Tariq
Jamison (another union steward), Tim Buryne, and Ms. Sanz. These workers have either
left the program or been transferred to other City jobs. Numerous older workers have
given their notice or already left. These are people with more than 10 years of seniority,
who are over 40.

55. After Ms. Sanz returned to work in February 2021, Ms. Sanz learned in March 2021 that
Mr. Peeples, for no reason associated with SOAR's best interest, had told gang members
in Ms. Sanz's assigned area that she lived in a rival gang's territory. This caused the gang
members with whom she worked to suspect her of colluding with the rival gang to obtain
inside information about them. This was not the case but Ms. Sanz understood that not all
gang members were convinced.

56. As a result of this unprofessional, dangerous, and retaliatory revelation by Peeples, Ms.
Sanz no longer felt safe in her assigned area. Ms. Sanz became fearful to work in her
assigned area and had to take FMLA for safety reasons, which began July 2021.

57. Defendants failed to engage Plaintiff in a dialog which would provide her with instructions, options or any other data relative to this leave or other possible leaves.

58. During this time that she was on leave she applied for a position at the Boston Public Schools (BPS), as a Family Liaison, doing much of the same work she was doing for SOAR. As there was an overlap in the shifts of each job, Ms. Sanz requested an accommodation to change the hours in which she worked at SOAR to accommodate her work schedule at BPS. Other workers had been allowed to work remotely.

59. On or about August 28, 2021, Ms. Sanz put in a disclosure to the City that she was working both jobs and wished to continue to do so with the accommodation noted above. On September 7, 2021, BPS submitted one as well.

60. That same day Defendants terminated Ms. Sanz from her position with SOAR without ever contacting her to discuss the accommodation requested, or to discuss her transfer from SOAR to BPS, which was done without her consent or notice.

61. Ms. Sanz believes this was in retaliation for speaking out against management's hostile, discriminatory and unsafe practices, and because she had taken FMLA leave.

### COUNT I
### Violation of the Massachusetts Whistleblower Act,
### M.G.L. c.149, sec. 185 (b)(1)
*Defendant City of Boston*

62. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

63. Defendants' actions constitute a violation of the Covid-19 mandate, which was a risk to public health and safety, in violation of M.G.L. c.149, sec. 185(b)(1).

64. As a result of Defendants' actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

65. Defendants are liable for three times the amount of Ms. Sanz's lost wages, front and back

pay, attorneys' fees and costs, multiple damages, compensatory damages, punitive and

other damages so proven at trial.

### COUNT II
### Retaliation in Violation of the Massachusetts Whistleblower Act,
### M.G.L. c.149, sec. 185 (b) (3)
*Defendant City of Boston*

*66.* The Plaintiff restates the foregoing paragraphs and incorporates them herein.

67. Defendants' actions constitute retaliation for Ms. Sanz's refusal to participate in actions

which violate the law or which put public health or safety at risk, in violation of M.G.L.

c.149, sec. 185(b)(3).

68. As a result of Defendants' actions, Ms. Sanz has suffered lost wages, both front and back

pay, compensatory damages and emotional distress.

69. Defendants are liable for three times the amount of Ms. Sanz's lost wages, front and back

pay, attorneys' fees and costs, compensatory damages, punitive and other damages so

proven at trial.

### COUNT III
### Intentional Infliction of Emotional Distress
*All Defendants*

70. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

71. Defendants' actions constitute intentional infliction of emotional distress.

72. As a result of Defendants' action, Plaintiff suffered emotional distress.

73. Defendants are liable for Plaintiff's emotional distress damages, punitive damages and

other damages so proven at trial.

### COUNT IV
### Breach of Implied Covenant of Good Faith and Fair Dealing
*All Defendants*

74. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

75. Defendants' actions constitute a breach of the Implied Covenant of Good Faith and Fair Dealing in failing to deal with Ms. Sanz in good faith and without malice.

76. As a result of Defendants' actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

77. Defendants are liable for Ms. Sanz's lost wages, front and back pay, compensatory damages, punitive and other damages so proven at trial.

## COUNT V
## Tortious Interference
*Defendant Leeroy Peeples*

78. Plaintiff restates the the foregoing paragraphs and incorporates them herein.

79. Defendant Leeroy Peeples' actions constitute tortious interference with Ms. Sanz's business relations as these actions were not in furtherance of the Defendants' mission, shock the conscience, and were done with malice.

80. As a result of Defendant Peeples' actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

81. Defendant Peeples is liable for Ms. Sanz's lost wages, front and back pay, compensatory damages, punitive and other damages so proven at trial.

## COUNT VI
## Retaliation in Violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. secs. 2611 and 2615
*All Defendants*

82. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

83. Defendants' actions constitute retaliation for taking leave, in violation of the Family and Medical Leave act, 29 U.S.C. secs. 2611 and 2615.

84. As a result of Defendant's actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

85. Defendants are liable for Ms. Sanz's lost wages, front and back pay, compensatory damages, punitive and other damages so proven at trial.

**COUNT VI**
**Violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. secs. 2611 and 2614.**
*All Defendants*

86. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

87. Defendants' actions constitute a violation of the Family and Medical Leave Act, 29 U.S.C. secs. 2611 and 2614.

88. As a result of Defendant's actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

89. Defendants are liable for Ms. Sanz's lost wages, front and back pay, compensatory damages, punitive and other damages so proven at trial.

**COUNT VI**
**Violation of the Massachusetts Paid Family and Medical Leave Act, M.G.L. c.175M sec. 9**

90. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

91. Defendant's actions constitute a violation of the Massachusetts Paid Family and Medical Leave Act, c.175M sec. 9.

92. As a result of Defendant's actions, Ms. Sanz has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

93. Defendants are liable for Ms. Sanz's lost wages, front and back pay, treble damages, compensatory damages, punitive and other damages so proven at trial.

13

WHEREFORE, the Plaintiff, Ms. Sanz, requests that the Court:

a.  Award full amount of her damages incurred as a result of Defendants' unlawful actions, including without limit punitive damages, reasonable attorneys' fees and costs incurred;

b.  Award Ms. Sanz multiple damages for Defendants' violations of M.G.L. c.149 section 185 and c.175M; and

c.  Award the Ms. Sanz such other and further relief as the Court deems appropriate.

**PLAINTIFF CLAIMS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE.**

Respectfully submitted,
Plaintiff,
UNDINI SANZ,

By Her Attorney,

*/s/ Janet Ruggieri*
Janet Ruggieri, BBO#634431
Murphy & Rudolf, LLP
Worcester, MA 01608
Telephone: (508) 425-6330
Fax: (508) 536-0834
ruggieri@murphyrudolf.com

Dated: January 4, 2022

**VERIFICATION OF COMPLAINT**

I, Undini Sanz, do hereby swear and affirm under the pains and penalties of perjury that the above facts are true and accurate to the best of my recollection.

Dated: January 4, 2022                    */s/ Undini Sanz*
                                          Undini Sanz